UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

BRIDGET MURRAY,

       Plaintiff,     **MEMORANDUM & ORDER**
                  13-CV-1336 (MKB)

   v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

   Plaintiff Bridget Murray filed the above-captioned action seeking review pursuant to 42 U.S.C. § 405(g) of a final decision of Defendant Commissioner of Social Security denying her application for disability insurance benefits. Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the Commissioner's decision is supported by substantial evidence. Plaintiff cross-moves for judgment on the pleadings, arguing that Administrative Law Judge Gal Lahat ("ALJ") failed to satisfy his duties in two aspects: (1) the ALJ improperly weighed evidence from Plaintiff's treating physicians; and (2) the ALJ did not properly assess Plaintiff's credibility. The Court heard oral argument on August 4, 2014. For the reasons set forth below, the Court grants Defendant's motion for judgment on the pleadings and denies Plaintiff's motion for judgment on the pleadings.

## I. Background

   Plaintiff was born in 1962. (R. at 37.) Plaintiff filed an application for disability insurance benefits on March 6, 2009, based on severe and persistent pain in her right shoulder and the inability to use her right upper extremity as a result of a workplace accident. (*Id.* at 9, 150–51, 165.) Plaintiff's application for disability benefits was denied. (*Id.* at 83.) Thereafter,

Plaintiff requested a hearing before the ALJ, which was initially scheduled for December 22, 2010, but adjourned and later held on March 7, 2011. (*Id*. at 9.) At the hearing, Plaintiff and Jay Steinbrenner, a vocational expert, testified. (*Id.*) By decision dated June 16, 2011, the ALJ found that Plaintiff was not disabled. (*Id*. at 24.) On February 5, 2013, the Appeals Council denied review of the ALJ's decision. (*Id*. at 1–4.)

### a. Plaintiff's testimony

Plaintiff is a widow and mother of three children. (*Id.* at 34, 37–38.) Since graduating college, Plaintiff has maintained uninterrupted employment as a nurse. (*Id.* at 39.) Plaintiff holds a bachelor's degree and a master's degree in nursing administration. (*Id.* at 39.) On November 26, 2007, Plaintiff was making her rounds at work when a patient wanted to be lifted upright in bed. (*Id.* at 40–41.) Plaintiff called a nursing assistant for help and Plaintiff and the nursing assistant lifted the patient. (*Id.* at 41.) Plaintiff felt a "twinge" of pain in her right shoulder. (*Id.*) This twinge subsided, but later that evening Plaintiff felt "achy." (*Id.*) After continuing pain, Plaintiff went to see her doctor and received an MRI which showed a tear in Plaintiff's right rotator cuff. (*Id.*)

On November 30, 2007, Plaintiff saw Dr. Altchek, an orthopedic attending surgeon at the Hospital of Special Surgery, where Plaintiff then worked. (*Id.*) Under the care of Dr. Altchek, Plaintiff received physical therapy throughout the month of December, underwent surgery in January 2008, and received further physical therapy post-surgery. (*Id.* at 41–42.) Since the accident, Plaintiff has gained weight due to her inability to exercise, has trouble sleeping due to pain on her right side, can lift "about five pounds" for only up to 10 or 15 minutes, and can type on a computer for no longer than 10 minutes. (*Id.* at 42–45.)

Plaintiff testified that she has trouble performing ordinary tasks such as grocery shopping, showering and getting dressed. (*Id.* at 45–46.) In a typical week, Plaintiff will go shopping, take her children to school by train or bus, visit her mother and go to the library. (*Id.* at 56–57.) Plaintiff's pain does not interfere with these activities because walking "takes [her] mind off" the pain and if not, she will take a Motrin. (*Id.* at 58.)

At the time of her testimony, Plaintiff was taking Actonel once a week, a calcium supplement twice daily, a daily multivitamin and over-the-counter Motrin as necessary. (*Id.* at 49.) Plaintiff ceased taking prescription pain relievers in May or April of 2010. (*Id.* at 50.) Rating her pain on a scale of one to ten, Plaintiff testified that her average pain was between 6 to 10, but with Motrin her pain decreases to 4.5 to 5. (*Id.*) Plaintiff is not receiving physical therapy nor seeing a specialist for her shoulder on the advice of Dr. Schwartz and her worker's compensation lawyer. (*Id.* at 50–51.) Dr. Schwartz informed her that she was at a "status quo with [her] range of motion, and whatever limitation -- whatever range I got, that's where I am." (*Id.* at 55.) Plaintiff did not seek a second opinion. (*Id.*) Plaintiff continues to perform exercises at home, including "therabands" and a "ball" which her therapist showed her how to perform. (*Id.* at 51.)

### b. Plaintiff's work history

Plaintiff worked as a registered nurse from January 1985 to November 2007. (*Id.* at 170.) Plaintiff has not engaged in any substantial gainful activity since November 26, 2007. (*Id.* at 40.)

### c. Vocational expert's testimony

Jay Steinbrenner, vocational expert, testified that Plaintiff's past work as a nurse was

skilled work with an SVP-7 rating.[1]  (*Id.* at 61.)  The ALJ then presented the following

hypothetical to Steinbrenner:

> A hypothetical individual of the claimant's age, education and
> work background.  Further assume the individual can lift and carry,
> as well as push-pull up to ten pounds occasionally with the right
> dominant upper extremity.  Further assume the individual would be
> limited to no overhead reaching or above shoulder reaching with
> the right dominant upper extremity; occasional reaching at waist or
> desk level; and again, no reaching below waist level with the right
> dominant upper extremity.  Further assume that the right hand
> could not be used for handling, which would include gross motor
> functions such as gripping, holding, and grasping; and could
> occasionally be used for fingering, with no limitation as to feeling.

(*Id.* at 61–62.)  Steinbrenner stated that this hypothetical worker could not perform Plaintiff's

past work.  (*Id.* at 62.)  Before commenting that the hypothetical worker was "pretty limit[ed]",

Steinbrenner stated that a job as a registration or intake clerk would "probably be viable."  (*Id.*)

This job is classified as sedentary-level, semi-skilled work with an SVP-3 rating.  (*Id.*)  With

respect to unskilled work, Steinbrenner stated that two jobs involving computer "mouse-

manipulat[ion]" would be viable: telemarking or telephone solicitation and telephone survey

work.  (*Id.* at 63.)  Steinbrenner also stated that it would not take more than a day to adapt to

using a computer mouse with one's non-dominant hand.  (*Id.* at 66.)

### d.  Medical evidence

#### i.  Doctor Alain D. Hyman

On November 28, 2007, Dr. Hyman examined Plaintiff's rotator cuff tear.  (*Id.* at 237.)

---

[1]  "SVP stands for 'specific vocational preparation,' and refers to the amount of time it
takes an individual to learn to do a given job." *Urena-Perez v. Astrue*, No. 06-CV-2589, 2009
WL 1726217, at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (quoting Jeffrey Scott Wolfe & Lisa B.
Proszek, *Social Security Disability and the Legal Profession* 163 (2002)), *report and
recommendation adopted as modified*, No. 06-CV-2589, 2009 WL 1726212 (S.D.N.Y. June 18,
2009).

Dr. Hyman noted an "[a]bnormal supraspinatus tendon with inhomogeneous signal, representing tendinosis[2] or contusion," "a partial thickness tear of the inferior surface," and "subacromial and subdeltoid bursitis."[3]  (*Id.*)

### ii.    Doctor David W. Altchek

Dr. Altchek performed an initial examination on December 6, 2007.  (*Id.* at 238.)  He noted that Plaintiff had limited active range of motion due to pain, had mild limitation of passive range due to pain, and had severely positive impingement signs and cuff signs particularly in abduction.  (*Id.*)  Dr. Atlchek discussed conservative treatment as well as surgical treatment options with Plaintiff.  (*Id.*)  On December 7, 2007, Dr. Altchek noted that Plaintiff would undergo arthroscopy and should not be working until she has regained her full range of motion and strength.  (*Id.* at 247.)

An "operative record," dated January 16, 2008, indicates that Plaintiff underwent right shoulder arthroscopy, rotator cuff repair, subacromial decompression and an acromioplasty performed by Dr. Altchek.  (*Id.* at 223.)  Plaintiff's rotator cuff showed a "significant amount of fraying a [sic] full thickness rotator cuff tear."  (*Id.* at 224.)  A "significant amount of bursa was removed."  (*Id.*)  The rotator cuff was debrided and after a subacromial decompression was completed, the rotator cuff repair was complete.  (*Id.* at 225.)

---

[2]  "Tendinosis is defined as '[d]egenerative lesions of a tendon without inflammation or symptoms . . . .  It usually progresses to inflammation (tendinitis) and, eventually, a tendon rupture."  *Calzada v. Asture*, 753 F. Supp. 2d 250, 258 n.16 (S.D.N.Y. 2010) (alterations in original) (quoting *Attorney's Illustrated Medical Dictionary* T:157 (West, July 2010 Supp.)).

[3]  "Bursitis is an '[i]nflammation of a bursa,' which is a 'closed sac or envelope lined with synovial membrane and containing fluid, usually found or formed in areas subject to friction.'"  *DeJesus v. Colvin*, No. 12-CV-7354, 2014 WL 667389, at *3 n.6 (S.D.N.Y. Feb. 18, 2014) (alteration in original) (quoting Stedman's Medical Dictionary 492, 259, 262 (27th ed. 2000) (internal citations omitted)).

On January 24, 2008, Dr. Altchek noted that Plaintiff was "coming along pain wise and is starting to do better." (*Id.* at 243.) Dr. Altchek planned to keep Plaintiff on her "protected rehab program" and to start physical therapy. (*Id.*) On March 10, 2008, Dr. Altchek noted that Plaintiff was doing well, had good passive motion, would stay on a protected rehabilitation program and would be seen again in eight weeks. (*Id.* at 244.) On April 14, 2008, Dr. Altchek noted that Plaintiff is "shrugging, but otherwise doing well." (*Id.* at 245.) On June 9, 2008, Dr. Altchek found that Plaintiff was "slowly getting better," "mildly tight," had improved motion and less pain. (*Id.* at 246.)

On October 2, 2008, Dr. Altchek found that Plaintiff had excellent motion and good strength. (*Id.* at 311.) On November 20, 2008, Dr. Altchek noted that Plaintiff is "starting to turn the corner and get all her motion back." (*Id.* at 310.) He advised Plaintiff that she was not ready to go back to work due to weakness and lack of endurance. (*Id.*)

On January 19, 2009, Dr. Alchek noted that Plaintiff is doing much better, her capsule is much looser and her strength is better. (*Id.* at 309.) He noted that Plaintiff was concerned about returning to heavy duty work, a concern which he shared. (*Id.*) He advised Plaintiff that she should switch over to an "ambulatory function" and planned on seeing Plaintiff "on an as needed basis." (*Id.*)

### iii. Rehabilitation therapy

On February 12, 2008, Plaintiff received an upper extremity evaluation by the Hospital for Special Surgery Rehabilitation Department. (*Id.* at 278.) The physical therapist noted that Plaintiff reported constant pain between 3 to 8 on a scale of 10 and that the pain was localized. (*Id.*) On May 9, 2008, Plaintiff's physical therapist noted on a "progress update" form that Plaintiff was still unable to reach overheard for brushing her hair or reaching into cabinets. On

June 6, 2008, Plaintiff's physical therapist noted that she was able to use her arm for activities "below horizontal," and was able to use her arm overhead but with pain. (*Id.* at 252.) The therapist also noted that Plaintiff had made "excellent" progress and would benefit from continued therapy to address pain, limitations and decreased activity. (*Id.*) On September 15, 2008, Plaintiff's physical therapist noted that her function was not equal to pre-operative levels. (*Id.* at 313.)

### iv.   Doctor Robert L. Hecht

On December 12, 2008, Dr. Hecht saw Plaintiff to offer a second opinion regarding treatment. (*Id.* at 297.) Dr. Hecht noted that Plaintiff underwent surgery on January 16, 2008, and reviewed the operative report from that surgery. (*Id.*) Upon a physical examination, Dr. Hecht found that Plaintiff had healed arthroscopic portals, tenderness in the shoulder, mild atrophy of the deltoid, mild weakness with abduction, and a restricted range of motion. (*Id.*) He advised Plaintiff to continue physical therapy and noted that she "remains disabled." (*Id.*)

On January 9, 2009, Dr. Hecht saw Plaintiff for a follow-up visit. (*Id.* at 296.) Dr. Hecht noted that Plaintiff had persistent pain, and limited range of motion in the right shoulder and that she had stopped doing physical therapy in December 2008. (*Id.*) Upon a physical examination, Dr. Hecht found that Plaintiff had tenderness in the shoulder, mild atrophy of the deltoid, mild weakness with abduction, and restricted range of motion. (*Id.*) He advised additional physical therapy. (*Id.*)

On February 27, 2009, Dr. Hecht physically examined Plaintiff and found that she had mild atrophy of the deltoid, mild weakness with abduction, and a loss of use of the right arm of 25%. (*Id.* at 295.)

### v.  Doctor J. Serge Parisien

On June 24, 2008, Dr. Parisien, an orthopedic surgeon, performed an independent medical examination of Plaintiff.  (*Id.* at 303.)  Dr. Parisien reviewed (1) an upper extremity rehabilitation evaluation dated February 20, 2008, and accompanying physical therapy progress notes, (2) Dr. Altchek's operative report dated January 16, 2009, (3) Dr. Altchek's examination report dated December 6, 2007, and (4) an MRI of Plaintiff's right shoulder dated November 28, 2007.  (*Id.* at 304.)  Dr. Parisien concluded that there is evidence of a mild disability and recommended that Plaintiff return to work with restrictions on lifting over 25 pounds.  (*Id.*)

### vi.  Doctor Barry Katzman

On December 2, 2008, Dr. Katzman, an orthopedic surgeon, performed an independent medical examination of Plaintiff.  (*Id.* at 300.)  Dr. Katzman noted that, at the time, Plaintiff was taking Actonel and receiving physical therapy weekly.  (*Id.* at 300–01.)  Upon a physical examination, Dr. Katzman noted "forward flexion and abduction to 110 degrees (normal is 180)." (*Id.* at 301.)  Dr. Katzman reviewed (1) rehabilitation therapy notes dated February 12, 2008, April 4, 2008, and December 17, 2007, (2) Dr. Altchek's notes dated February 12, 2008, December 6, 2007, and December 7, 2007, and (3) an MRI of the right shoulder dated November 28, 2007.  (*Id.*)  He concluded that Plaintiff suffered a 40% schedule loss of use.  (*Id.*)

### vii.  Doctor Stanley Mathew

On June 6, 2009, Dr. Mathew performed an orthopedic examination of Plaintiff on referral from the Division of Disability Determination.  (*Id.* at 324.)  He noted that Plaintiff's only prescription medication was Actonel at 35mg weekly.  (*Id.*)  He recognized that Plaintiff alleged difficulty with cooking, cleaning, laundry, shopping and childcare. (*Id.*)  Upon a physical examination, Dr. Mathew found that on her right side, Plaintiff had flexion of 0 to 130 degrees,

abduction of 0 to 80 degrees with pain, and internal rotation of 0 to 20 degrees with pain. (*Id.* at 325.) He diagnosed Plaintiff with chronic right shoulder pain and found Plaintiff severely limited with her right upper extremity for overhead activities. (*Id.* at 326.)

### viii. Doctor Steven Moalemi[4]

On April 6, 2010, Dr. Moalemi, one of Plaintiff's treating physicians, noted that Plaintiff could: (1) occasionally lift 1 to 10 pounds and never lift anything heavier, (2) occasionally drive, reach at waist level, and perform "fine motor fingering," (3) never climb, reach above her right shoulder or below waist level, or grasp or grip with her right hand, and (4) constantly balance, stoop, kneel, crouch, perform "fine motor fingering" with her left hand, and feel with both hands. (*Id.* at 356–57.) The evaluation also notes that the restrictions would be reassessed within three months. (*Id.* at 357.)

On September 21, 2010, Dr. Moalemi, re-evaluated Plaintiff. (*Id.* at 344.) Upon a physical examination, Dr. Moalemi noted the following limited ranges of motion on Plaintiff's right shoulder: flexion to 150 degrees, abduction to 145 degrees, internal rotation to 60 degrees, and external rotation to 75 degrees. (*Id.*) He also noted that Plaintiff showed pain and weakness with "resisted external rotation or abduction" due to her rotator cuff tear and adhesive capsulitis.[5]

---

[4] The record contains "follow-up" notes from Dr. Moalemi dated January 12, 2010, March 23, 2010, April 6, 2010, April 21, 2010, May 25, 2010 and July 19, 2010. (R. at 346–353, 359, 361, 363.) However, the writing is mostly illegible. Also illegible are the majority of "progress notes" from Dr. Moalemi dating from February 2010 to November 3, 2010. (*Id.* at 378–381.) However, the legible portion of these notes do show that Plaintiff performed household chores, reported improvement with her right shoulder, felt better overall, and felt increased strength despite consistently reporting stiffness and pain in her right shoulder during certain movements. (*Id.*)

[5] Adhesive capsulitis is "a shoulder affected by severe pain, stiffness, and restricted motion." *Connolly v. Calvanese*, No. 11-CV-0164, 2012 WL 2062395, at *6 n.10 (N.D.N.Y.

(*Id.*)  Dr. Moalemi concluded that while Plaintiff continues to improve, it was "medically necessary for [Plaintiff] to continue with physical therapy treatments" and she "continues to be disabled."  (*Id.*)

On March 15, 2011, Dr. Moalemi noted in an orthopedic report that Plaintiff's loss of joint motion and total impairment satisfied Listing 1.08 of the Listing of Impairments and that her condition would deteriorate if forced to perform regular work continuously.  (*Id.* at 400.)  Dr. Moalemi also indicated on a physical functional capacity evaluation that Plaintiff is capable of repetitive "fine manipulation" with both hands but only for shorts period of time with her right hand, and that she can perform "simple grasping" and pushing and pulling with her left hand only.  (*Id.* at 401.)  In addition, Dr. Moalemi noted that Plaintiff could only occasionally bend and squat, and could never crawl, climb or reach above shoulder level.  (*Id.*)

### ix.  Doctor Evan Schwartz

On November 4, 2010, Dr. Schwartz evaluated Plaintiff.  (*Id.* at 384.)  He reviewed Plaintiff's medical records which included x-rays of the shoulder and Dr. Alteck's operative report dated January 16, 2009.  (*Id.*)  Upon a physical examination, he noted that her neck had some mild decreased range of motion with some minimal pain.  (*Id.*)  He concluded that Plaintiff, two years and ten months post-surgery, continued to have pain and limitation, especially with reaching overhead and behind, and with lifting.  (*Id.* at 385.)  He found that she was at "maximum medical improvement" and would not benefit from further physical therapy or other treatments.  (*Id.*)  Dr. Schwartz found Plaintiff's scheduled loss to be 15% for the rotator cuff repair, 15% for loss of full forward flexion, and 7.5% for loss of internal rotation, resulting

June 7, 2012) (citation and internal quotation marks omitted), *aff'd*, 515 F. App'x 62 (2d Cir. 2013).

in a permanent "mild, partial disability to her right shoulder which limits her ability to do any overhead work or heavy lifting." (*Id.*)

On December 6, 2010, Dr. Schwartz completed a workers' compensation board EC-4.3 form. (*Id.* at 387.) He noted that Plaintiff had a schedule loss of 37.5%, which included 15% of the rotator cuff, 15% of full forward flexion, and 7.5% of internal rotation. (*Id.* at 388.) He further indicated that Plaintiff had lifting and upper extremities work limitations. (*Id.* at 389.)

Included in the record is an undated orthopedic report, signed by Dr. Schwartz, which indicates that Plaintiff's condition is permanent.[6] (*Id.* at 392.) The report also indicates that Plaintiff's impairment meets or equals the severity level of section "102 B" in Appendix 1 of the SSA regulations but notes regular work on a continuous basis would not cause Plaintiff's condition to deteriorate. (*Id.*)

On March 17, 2011, pursuant to a request by the ALJ, Dr. Schwartz completed another orthopedic report, in which he indicated that Plaintiff suffers from chronic pain, that Plaintiff's impairment meets or equals the severity level of Listing "1.08 M," and that regular work on a continuous basis would cause Plaintiff's condition to deteriorate. (*Id.* at 396.) Dr. Schwartz also indicated on a physical functional capacity evaluation that Plaintiff is capable of repetitive "simple grasping" and "fine manipulation" with both hands but that she can only push and pull with her left hand. (*Id.* at 397.) Finally, Dr. Scwartz noted that Plaintiff could frequently bend, squat, crawl, and climb but that she could never reach above shoulder level. (*Id.*)

---

[6] Although the report itself is undated, it was presented to the ALJ by letter dated February 22, 2011. (R. at 390.)

### e. Other evidence

#### i. Radiology report

A June 10, 2009 x-ray of Plaintiff's right shoulder showed no evidence of acute fracture, dislocation or destructive bony lesion. (*Id.* at 328.) In addition, the joint spaces were relatively well maintained and there was a "suture anchor in the humeral head." (*Id.*)

#### ii. Physical residual functional capacity assessment

On August 14, 2009, D. Greenberg,[7] a disability analyst, found that Plaintiff could stand or walk about 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour workday, but had limited push and/or pull capacity. (*Id.* at 331.) Greenberg found that Plaintiff had pain in the right shoulder and limited range of motion with flexion 0 to 130 degrees, abduction 0 to 80 degrees with pain, internal rotation 0 to 20 degrees with pain, external rotation 0 to 60 degrees with pain, and noted that Plaintiff's pain was described as 5 out of 10. (*Id.*) Greenberg concluded that Plaintiff's statements concerning her limitations and pain were "partially credible." (*Id.* at 334.) Greenberg relied on Dr. Mathew's medical opinion and concluded that Plaintiff was limited to a "narrow range of light work." (*Id.* at 334.)

#### iii. Workers' compensation history

After a workers' compensation hearing on February 26, 2009, Plaintiff was awarded a total of $16,963.95 in benefits covering the period between November 26, 2007 to August 2, 2008. (*Id.* at 147.) The award letter noted that based on "the nature of the established injury, it is possible that the claimant will have a permanent disability. . . . However, at this time, the Workers' Compensation Board does not have sufficient medical evidence of a permanent disability." (*Id.* at 147–148.)

---

[7] Greenberg's first name is not in the record.

At a workers' compensation hearing held on October 27, 2010, Plaintiff was authorized to receive an orthopedic consultation, awarded payment for medical providers, and granted continuing "symptomatic treatment." (*Id.* at 205.)

### f. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required, and more fully discussed below. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2007. (*Id.* at 11.) Second, the ALJ determined that Plaintiff has the following severe impairment: "right shoulder impairment, status post arthroscopic decompression and acrimioplasty with diagnosis of adhesive capsulitis." (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in Appendix 1 of the regulations. (*Id.* at 12–14.) The ALJ specifically considered Listing 1.02 for major dysfunction of a joint, Listing 1.07 for fracture of an upper extremity, and Listing 1.08 for soft tissue injury. (*Id.*)

With respect to Listing 1.02, the ALJ acknowledged that Plaintiff has restrictions to the use of her right upper extremity but explained that the listing criteria were not satisfied, "most notably because only one upper extremity is affected." (*Id.* at 13.) As for Listing 1.07, the ALJ noted that Plaintiff presented no evidence of a fracture and further noted that the record reflects that Plaintiff has improved to the point that she can independently initiate, sustain and complete activities of daily living. (*Id.*) With respect to Listing 1.08, the ALJ found that there was no evidence of a soft tissue injury as contemplated by the listing. (*Id.*) The ALJ also noted that Listing 1.08 requires that the lack of major function or the expectation of major function not be restored within 12 months of onset and found that the record supported the conclusion that Plaintiff's function, although not equivalent to pre-injury function, had been restored to such an

extent that she could engage in basic work activities on a sustained basis. (*Id.* at 14.)

Fourth, the ALJ determined that Plaintiff was unable to perform past-relevant work. (*Id.*)

The ALJ found that Plaintiff had the following residual functional capacity:

> The claimant has no limitations as to sitting or standing/walking. The claimant is limited to lifting/carrying and pushing/pulling ten pounds occasionally with her right dominant upper extremity. The claimant can balance, kneel, and crouch, but must avoid climbing and crawling. The claimant must avoid reaching above the shoulder and below the waist, but can engage in occasional reaching at the waist (desk) level with her right upper extremity. The claimant is unable to handle (i.e. holding, gripping, grasping), with the right upper extremity but is capable of occasional use of her right upper extremity for fingering and has no restriction as to feeling.

(*Id.*) The ALJ acknowledged that Plaintiff has significant restrictions of her right upper extremity but concluded that those restrictions do not preclude Plaintiff from performing all work. (*Id.* at 16.) The ALJ noted that treatment for Plaintiff's condition has been conservative since her January 2008 surgery, and the record shows that physical therapy treatment was followed and resulted in improvement. (*Id.* at 21.) The ALJ determined that Plaintiff could not perform all or substantially all of the requirements of light work but could perform a significant number of jobs in the national economy and therefore, the ALJ held that Plaintiff was not disabled. (*Id.* at 23.)

## II. Discussion

### a. Standard of Review

In reviewing a final decision of the Commissioner, a district court must determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam) (quoting *Kohler v. Astrue*, 546 F.3d 260, 264–65 (2d Cir.

2008)); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  Substantial

evidence requires "more than a mere scintilla." *Selian*, 708 F.3d at 417 (quoting *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting

*Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).  "It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417

(citation and internal quotation marks omitted).  Once an ALJ finds facts, the court "can reject

those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec.*

*Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In

deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's

resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012).  The Commissioner's factual findings "must be given conclusive effect so long as they are

supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation

and internal quotations omitted).  If, however, the Commissioner's decision is not supported by

substantial evidence or is based on legal error, a court may set aside the decision of the

Commissioner. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *see Box v. Colvin*, --- F.

Supp. 2d ---, ---, 2014 WL 997553, at *13 (E.D.N.Y. Mar. 14, 2014) ("When reviewing the

decision of the Commissioner, the Court may set aside the determination only if the decision was

based on legal error or was not supported by substantial evidence in the administrative record.").

"The Act must be liberally applied, for it is a remedial statute intended to include not exclude."

*Moran*, 569 F.3d at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

      **b.  Availability of benefits**

      Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act (the "Act").  To be eligible for disability benefits

under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v*, 546 F.3d at 265 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

    **c.** **Analysis**

Defendant moves for judgment on the pleadings, claiming that the Commissioner's decision is supported by substantial evidence and should be affirmed. Plaintiff cross-moves for judgment on the pleadings, arguing that the ALJ failed to satisfy his duties in two aspects: (1) the

ALJ improperly weighed evidence from Plaintiff's treating physicians and (2) the ALJ did not properly assess Plaintiff's credibility.

### i. Treating physician rule

Plaintiff argues that the findings of Plaintiff's treating physicians, Dr. Altchek, Dr. Hecht, Dr. Moalemi and Dr. Schwartz, were "lightly disregarded" in violation of the treating physician's rule. (Pl. Mem. 17–18.) Defendant argues that the ALJ correctly evaluated the opinions from Plaintiff's treating physicians. (Def. Reply Mem. 2–6.) The Court agrees with Defendant and finds that the ALJ properly applied the law and his decisions to give great weight, some weight, and no weight to various opinions from Plaintiff's treating physicians were supported by substantial evidence.

"A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012). But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam)); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing treating physician rule). A treating source is defined as a

plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors in determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32 (discussing the factors). The ALJ must set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d at 32. The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33.

Before determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act." *Moran*, 569 F.3d at 112

(alterations omitted) (quoting *Cruz*, 912 F.2d at 11); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion. *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. Mar. 22, 2013) (remanding for failure to develop the record); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))). "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, No. 08-CV-3796, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14

(S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

Here, Plaintiff argues that there was "overwhelming credible medical evidence from the treating physicians substantiating and corroborating Plaintiff's allegations (i.e., persistent chronic pain, restricted range of motion of the right shoulder)." (Pl. Mem. 18.) Plaintiff argues that this evidence supports a finding that Plaintiff's impairment met the requirements of, "at least," Section 1.08 of the listed impairments, which requires Plaintiff to show that she has a soft tissue injury. (*Id.*) Before the Court can assess whether the ALJ adhered to the treating physician rule, the requirements of Listing 1.08 warrant some discussion.

### 1.  Listing 1.08

Listing section 1.08 requires that Plaintiff show that she has a:

> Soft tissue injury (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 1.08; *see also Kiernan v. Astrue*, No. 12-CV-459, 2013 WL 2323125, at *6 (E.D. Va. May 28, 2013) ("Listing 1.08 contains the following elements: (1) a soft tissue injury of an upper or lower extremity, trunk, or face and head; (2) under continuing surgical management, as defined in [1.00(M)]; (3) directed toward the salvage or restoration of major function; and, (4) such major function was not restored or expected to be restored within 12 months of onset."). The SSA regulations do not define "soft tissue injury" other than identifying "burns" as an example of such an injury. *Id.* Listing 1.00(M) defines "continuing surgical management" as "surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part." 20

C.F.R. Part 404, Subpart P, App. 1, § 1.00(M).

"Major function" is not defined under the SSA regulations. In evaluating whether an individual's major function has been restored under Listing 1.08, or its predecessor 1.13, courts have looked to the definition of "functional loss." *See, e.g.*, *Kiernan*, 2013 WL 2323125, at *6 (noting, with approval, that the ALJ "addressed [whether major function was restored] by considering the definition of 'loss of function'"); *Corchado v. Astrue*, No. 12-CV-52, 2013 WL 324022, at *5 (D.N.H. Jan. 29, 2013) (finding that, for purposes of Listing 1.08, loss of major function has the same meaning as "functional loss" as defined in the regulations (citing 20 C.F.R., Pt. 404, Subpart. P, App. 1, § 1.00(B)(2)(a))); *Howl v. Astrue*, No. 08-CV-0038, 2011 WL 91130, at *14 (M.D. Tenn. Jan. 10, 2011) (same) (quoting 20 C.F.R., Pt. 404, Subpart. P, App. 1, § 1.00(B)(2)(c)), *report and recommendation adopted*, No. 08-CV-0038, 2011 WL 743398 (M.D. Tenn. Feb. 23, 2011). Functional loss "for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the *inability to perform fine and gross movements effectively on a sustained basis for any reason*, including pain associated with the underlying musculoskeletal impairment." 20 C.F.R., Pt. 404, Subpart. P, App. 1, § 1.00(B)(2)(a) (emphasis added). Because Plaintiff suffers from an impairment of the upper extremity, Plaintiff's ability to ambulate effectively is not at issue.[8] The Court focuses instead on whether Plaintiff lacks the ability to perform fine and gross movements. The inability to

---

[8] "Ineffective ambulation is defined as 'having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.'" *Serrano v. Astrue*, No. 10-CV-468, 2011 WL 1399465, at *8 (D. Conn. Apr. 12, 2011) (quoting 20 C.F.R. Part 404, Subpart P, App. 1, Pt. A, § 1.00(B)(2)(b)). Nothing in the record suggests that Plaintiff had or has any problem with her lower extremities and Plaintiff conceded such at oral argument on August 4, 2014.

perform fine and gross movements is defined as:

> [A]n impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R., Pt. 404, Subpart. P, App. 1, § 1.00(B)(2)(c).

Finally, "when there has been no surgical or medical intervention for 6 months after the last definitive surgical procedure, it can be concluded that maximum therapeutic benefit has been reached." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(N). "Evaluation at this point must be made on the basis of the demonstrable residual limitations, if any, considering the individual's impairment-related symptoms, signs, and laboratory findings, any residual symptoms, signs, and laboratory findings associated with such surgeries, complications, and recuperative periods, and other relevant evidence." *Id.*; *see also Wood v. Comm'r of Soc. Sec.*, No. 08-CV-882, 2010 WL 1253992, at *3 (S.D. Ohio Feb. 18, 2010) ("Once surgical management ends with maximum medical improvement, the regulations instruct evaluation of 'demonstrable residual limitations.'" (citation and internal quotation marks omitted)), *report and recommendation adopted*, No. 08-CV-882, 2010 WL 1253989 (S.D. Ohio Mar. 24, 2010).

## 2. Application

### A. Plaintiff's soft tissue injury

At least two district courts have suggested that muscle tears are "soft tissue injuries." *See Cranmer v. Astrue*, No. 07-CV-11386, 2008 WL 3084706, at *4 (D. Mass. Aug. 5, 2008) ("both

a meniscal tear and a partial tear of the ACL may qualify in a very broad sense as a soft tissue injury"); *Allard v. Chater*, No. 96-CV-4646, 1997 WL 573400, at *15 (N.D. Ill. Sept. 11, 1997) (remanding for consideration of whether the plaintiff's injuries, including a torn ligament, a rotator cuff tear and a possible torn meniscus, satisfied Listing 1.13, the precursor to Listing 1.08). The ALJ found that the record contained no evidence of a "soft tissue injury as contemplated by the listing," but he nevertheless evaluated Plaintiff's impairment as if it were a soft tissue injury. (R. at 13.) Although the ALJ may have erred in concluding that there was no evidence of a "soft tissue injury," the error was harmless as the ALJ continued his analysis assuming there was such an injury. The Court assumes without deciding that Plaintiff's rotator cuff tear is a soft tissue injury within the meaning of Listing 1.08. The Court must therefore consider whether Plaintiff was "under continuing surgical management" and whether "the major function was restored or expected to be restored within 12 months of onset."

### B. Continuing surgical management directed toward the salvage or restoration of major function

Plaintiff underwent a single surgery in January 2008. There is nothing in the record to indicate that Plaintiff underwent any other surgical procedure. However, the record does show that Plaintiff received rehabilitation therapy and that such therapy was part of her post-operative plan prescribed by Dr. Altchek. (*Id.* at 244.) In January 2009, Dr. Hecht advised Plaintiff to continue with physical therapy. (*Id.* at 296.) Arguably, Plaintiff's rehabilitation is an "associated treatment[] related to the efforts directed toward the salvage or restoration of functional use of the affected part." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(M). Plaintiff ceased all physical therapy in November 2010 because, according to Dr. Schwartz, Plaintiff had reached "maximum medical improvement." (R. at 385.) In an abundance of caution the ALJ evaluated Plaintiff's functional loss during the first 12 months of the onset of her impairment,

23

while she was under the exclusive care of Dr. Altchek and the Hospital for Special Surgery Rehabilitation Department, as well as on the basis of Plaintiff's "demonstrable residual limitations" subsequent to the completion of all surgical and medical intervention. (*Id.* at 16–17.)

### C. Major function not restored or expected to be restored within 12 months of onset

The ALJ concluded that Plaintiff did not meet or equal the requirements of Listing 1.08 because the post-operative record reflects that Plaintiff's impairment improved within 12 months of its onset. (*Id.* at 13–14.) In so concluding, the ALJ primarily relied on Plaintiff's therapy records which, as of June 2008, reflected that Plaintiff had made "excellent" progress but, as the ALJ noted, was not equal to pre-operative function. (*Id.* at 252, 313.) Plaintiff represented at oral argument that the ALJ failed to adhere to the treating physician rule with respect to the findings of Dr. Altchek, but the record belies Plaintiff's argument. The ALJ noted that Dr. Altchek reported steady improvement and although he had concerns about Plaintiff returning to her previous job, he did suggest that she was ready to return to employment but in an "ambulatory function." (*Id.* at 17.) Such an assessment is completely in accordance with the ALJ's finding that Plaintiff could not return to her previous job as a nurse but was capable of performing work available in the national economy. The record is devoid of any documentation from Dr. Altchek subsequent to January 2009.

With respect to Plaintiff's present limitations, Plaintiff's own testimony supports the ALJ's conclusion that Plaintiff failed to prove the lack of major function. Plaintiff testified that her typical day included getting dressed, eating, reading, walking, and taking her children to school. (*Id.* at 15.) Although more elaborate meals require assistance, Plaintiff can prepare simple meals for herself and her children. (*Id.*) Plaintiff also testified that she performs home

exercises with a theraband and ball. (*Id.* at 51.) Plaintiff, by her own admission, can perform many tasks of daily life demonstrating that she does not lack the ability to perform fine and gross movements. *See Vidal v. Colvin*, No. 13-CV-5413, 2014 WL 1682237, at *7 (C.D. Cal. Apr. 29, 2014) (finding that "the record shows that Plaintiff maintains sufficient ability to perform fine and gross movements to carry out activities of daily living, such as preparing simple meals, performing light chores, and maintaining personal hygiene."); *Jenkins v. Comm'r, Soc. Sec. Admin.*, No. 13-CV-1967, 2014 WL 1870845, at *2 (D. Md. May 5, 2014) (finding that "evidence that [the plaintiff] makes simple meals at times, cares for children, and attends to her personal hygiene" supported the ALJ's determination that the plaintiff was not unable to perform fine and gross movements).

In concluding that Plaintiff did not meet or equal Listing 1.08 based on her demonstrable residual limitations, the ALJ relied on the findings and opinions within physical therapy rehabilitative notes, (R. at 17), and medical findings from Dr. Katzman, (*id.* at 18), Dr. Parisien, (*id.* at 19), and Dr. Mathew, (*id.*), in addition to Plaintiff's treating physicians, Dr. Altchek, (*id.* at 17), Dr. Hecht, (*id.* at 18), Dr. Schwartz and Dr. Moalemi, (*id.* at 19–20). As already stated, Dr. Altchek's records reveal that Plaintiff steadily improved after surgery, and in November 2008, was "turn[ing] the corner and get[ting] all her strength back." (*Id.* at 311.) Dr. Hecht found that Plaintiff suffered a scheduled loss of her right arm of 25% and Dr. Katzman found that Plaintiff suffered a scheduled loss of her right arm of 40%, the ALJ gave these findings some weight and noted that the assessments were "consistent with finding some restrictions, but not reflective of a complete inability for sustained functioning." (*Id.* at 18.) The ALJ also credited the findings of non-treating physicians Dr. Parisien and Dr. Mathew, both of whom noted limitations on Plaintiff's range of motion and ability to lift heavy objects. (*Id.* at 18–19.)

After almost a year of non-treatment, Plaintiff saw Dr. Moalemi in January 2010. (*Id.* at 19.) In April 2010, Dr. Moalemi concluded that Plaintiff could only lift, carry, push and pull up to 10 pounds with her right hand and had no restrictions with her left upper extremity. (*Id.*) Plaintiff also began to see Dr. Schwartz in November 2010 and who concluded, in a November 2010 report, that Plaintiff reached her maximum medical improvement and had a permanent, mild, partial disability of the right shoulder with a total loss of 37.5%. (*Id.* at 20.) Although the ALJ rejected Dr. Moalemi's and Dr. Schwartz's ultimate conclusions that Plaintiff was disabled, the ALJ did recognize the majority of their findings concerning Plaintiff's physical limitations. (*Id.* at 19–20.) The ALJ concluded that "even with these restrictions . . . [Plaintiff] is still capable of performing basic work activities on a sustained basis." (*Id.* at 19); *cf. Vines v. Barnhart*, No. 05-CV-763, 2006 WL 2822177, at *8 (W.D. Tex. Sept. 28, 2006) ("While the Plaintiff's foot impairments are serious, they do not reach the level contemplated in the listings . . . .").

The ALJ gave "great weight" to Dr. Moalemi's January and April 2010 findings concerning Plaintiff's functional capacity, including the findings that Plaintiff had no restrictions to her left upper extremity, could perform gross motor activities occasionally with both hands, could never climb or crawl, and could never reach above the shoulder or below the waist with her right upper extremity. (R. at 19.) With respect to Dr. Moalemi's March 2011 findings that Plaintiff (1) satisfied the requirements of Listing 1.08, (2) could not lift any weight for the twelve month period after her surgery, (3) and would suffer significantly limiting side effects from medication, the ALJ gave these findings "limited weight" due to Dr. Moalemi's failure to distinguish between Plaintiff's restrictions on her right and left side, a significant lapse in treatment of almost 6 months, and inconsistency between his conclusions and his progress notes evidencing improvement. (*Id.* at 20.) With respect to Dr. Schwartz, the ALJ gave his medical

opinions some, but not controlling, weight. (*Id.*) The ALJ accepted Dr. Schwartz's finding that

Plaintiff could not perform heavy lifting, had no restrictions on simple grasping and fine

manipulation, and was incapable of reaching above shoulder level. (*Id.*) The Court notes that

the medical findings of Dr. Moalemi and Dr. Schwartz were not consistent.[9] "The ALJ has the

authority to weigh these opinions, resolve any conflicts, and determine how much weight to

accord any particular opinion." *Hendricks v. Comm'r of Social Sec.*, 452 F. Supp. 2d 194, 200

(W.D.N.Y. 2006); *see also Astrue*, 537 F.3d at 128 (noting that "[g]enuine conflicts in the

medical evidence are for the Commissioner to resolve" (alteration in original)). The ALJ

properly afforded no weight to the conclusions of both doctors that Plaintiff satisfied the

requirements of Listing 1.08 since this determination is left to the ALJ.[10] *See Pope v. Barnhart*,

---

[9] In their respective March 2011 reports, drafted after Plaintiff's ALJ hearing, Dr. Moalemi opined that Plaintiff could "never" climb and crawl, could not perform simple grasping with her right hand and could perform fine manipulation with her right hand for short periods of time, (R. at 401–02), while Dr. Schwartz opined that Plaintiff could frequently climb and crawl, could perform simple grasping and fine manipulation with both hands without any temporal restrictions, (*id.* at 397–98).

[10] Plaintiff argues that the ALJ erred in not seeking additional information from Plaintiff's treating physicians to support their conclusions that Plaintiff met or equaled the requirements of Listing 1.08. (Pl. Mem. 23.) The ALJ did attempt to develop the factual record with respect to Dr. Schwartz's conclusion that Plaintiff met or equaled the requirements of Listing 1.02. (R. at 72 ("I'd appreciate it if you would go ahead and re-contact Dr. Schwartz and have him better explain, to the extent he's able, his opinion that the claimant would have an impairment that would meet or equal listing 1.02B . . . . And if he could just identify exactly what are the clinical diagnostic and other laboratory findings, and correlate between the listing requirements and his opinion, I think that would be of help in this matter.").) The ALJ's directive concerned Listing 1.02 because, at the time of the hearing, there was no statement in the record from Plaintiff's treating physicians that she satisfied the requirements of Listing 1.08. After the hearing, Plaintiff submitted records from Dr. Schwartz and Dr. Moalemi, which included opinions from each that Plaintiff satisfied the requirements of Listing 1.08 instead of Listing 1.02. (*Id.* at 396, 400.) Plaintiff argues that it was reversible error for the ALJ to not contact either physician for further information or clarification. (Pl. Mem. 24.) However, "it is well-established that 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'" *Lluberes v. Colvin*, No. 13-

57 F. App'x 897, 899 (2d Cir. 2003) (noting that a treating physician's conclusion that a plaintiff is "'completely disabled' may not be given controlling weight because this issue is reserved for the Commissioner"); *Torres v. Colvin*, No. 12-CV-6527, 2014 WL 241061, at *17 (S.D.N.Y. Jan. 22, 2014) ("[W]hether the claimant has an impairment that meets or equals a Listings-level impairment is a determination reserved to the Commissioner, and a treating physician's opinion regarding the criteria for a Listing is not entitled to controlling weight." (citing *Hendricks*, 452 F. Supp. 2d at 199)).

The ALJ also rejected Dr. Schwartz's and Dr. Moalemi's conclusions that Plaintiff met or equaled the requirements of Listing 1.08 as inconsistent with some of their own prior medical findings and inconsistent with the record as a whole. It was not error for the ALJ to do so as it is the Commissioner's role to weigh conflicting medical evidence. *See Veino*, 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). Similarly, Plaintiff's argument that the ALJ had a duty to obtain the testimony of an independent orthopedic medical advisor is without merit. *See* 20 C.F.R. § 404.1527(e)(2)(iii) ("Administrative law judges *may* also ask for and consider opinions from medical experts . . . ." (emphasis added)); *see also Cole v. Astrue*, No. 06-CV-769, 2013 WL 4398974, at *4 (S.D.N.Y. Aug. 7, 2013) ("Plaintiff provides no support for his claim that ALJ Katz was *required* to consult an expert in addition to reviewing the medical evidence in the record.").

Rather than summarily rejecting the medical opinions of Plaintiff's treating physicians, the ALJ explained why some findings were credited great, some, or little weight and discussed

---

CV-4027, 2014 WL 2795256, at *7 (S.D.N.Y. June 20, 2014) (quoting *Rosa*, 168 F.3d at 79 n.5); *Schrock v. Schrock*, No. 12-CV-1898, 2014 WL 2779024, at *9 (N.D.N.Y. June 19, 2014) (same).

why he ultimately disagreed with the conclusion, from two of Plaintiff's treating physicians, that Plaintiff satisfied the requirements of Listing 1.08.[11] *See Lluberes*, 2014 WL 2795256, at *8–9 (finding no error where the ALJ rejected a treating physician's conclusion when there was objective medical evidence to the contrary, including the treating physician's own treatment records).

### ii. Credibility

Plaintiff argues that the ALJ improperly rejected subjective evidence of pain and functional limitation, (Pl. Mem. 24–25), while Defendant argues that the ALJ properly weighed Plaintiff's credibility, (Def. Reply Mem. 6–8). The Court agrees with Defendant and finds that the ALJ properly assessed Plaintiff's credibility.

While SSA regulations require an ALJ "to take the claimant's reports of pain and other limitations into account, he or she is not required to accept the claimant's subjective complaints without question." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (alteration omitted) (quoting *Genier*, 606 F.3d at 49). Rather, the ALJ evaluates the claimant's contentions of pain through a two-step inquiry. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," including pain. *Genier*, 606 F.3d at 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "If so, the ALJ must then consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Campbell*, 465 F. App'x at 7 (alteration in original) (quoting *Genier*, 606 F.3d at 49).

_____

[11] In finding the ALJ's conclusion that Plaintiff fails to meet the requirements of Listing 1.08 is supported by substantial evidence, the Court also finds that substantial evidence supports the ALJ's conclusion that Plaintiff fails to meet the requirements of Listing 1.02 since Listing 1.02 also requires the inability to perform fine and gross movements as defined in 20 C.F.R. §404.1529(c)(3).

At the second stage, the ALJ must first consider all of the available medical evidence, including a claimant's statements, treating physician's reports, and other medical professional reports. *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012). To the extent that a claimaint's allegations of pain "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors*, 370 F. App'x at 184 (citing § 404.1529(c)(3)(i)–(vii)). In conducting the credibility inquiry, the ALJ must consider seven factors.[12]

Plaintiff argues that the ALJ erred in not applying the seven factors listed in 20 C.F.R. §404.1529(c)(3) for assessing the credibility of Plaintiff's allegations. (Pl. Mem. 26.) As a preliminary matter, explicit citation to the factors enumerated in 20 C.F.R. § 404.1529(c)(3) is not required. *See Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) ("Although the ALJ did not explicitly recite the seven relevant factors, his credibility determination was supported by substantial evidence in the record."). Here, however, the ALJ did state the factors relevant to an assessment of Plaintiff's credibility. (R. at 15.) In assessing Plaintiff's credibility as to the intensity and pervasiveness of her symptoms, the ALJ noted that (1) Plaintiff has received conservative care since her January 2008 surgery, (2) Plaintiff does not take prescription medication, and (3) although Plaintiff has functional restrictions in her dominant upper extremity, such restrictions do not result in a finding of disabled. (*Id.* at 21.) While the ALJ did

_____

[12] The factors are:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

20 C.F.R. § 404.1529(c)(3)(i)–(vii); *Meadors v. Astrue*, 370 F. App'x 179, 183 n.1 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).

not expressly reference § 404.1529(c)(3) in his application, he did thoroughly address Plaintiff's allegations and permissibly weighed their credibility. The Court also notes that the ALJ did credit much of Plaintiff's testimony and only withheld "full credibility" to Plaintiff's allegation that her sole impairment prevented her from performing "all work" on a sustained basis. (*Id.* at 21.) Based on the entire record, including Plaintiff's own testimony, the Court finds that the ALJ's credibility determination was supported by substantial evidence.

**III. Conclusion**

For the foregoing reasons, the Court finds that there is substantial evidence in the record to support the ALJ's decision, and Defendant's motion for judgment on the pleadings is granted. Plaintiff's cross motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

SO ORDERED:

_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge

Dated: August 21, 2014
        Brooklyn, New York